# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

OCTOBER 25, 2007[Œ]
OPINION PUBLISHED NOVEMBER 1, 2007

**Before**[ŒŒ]

Hon. FRANK H. EASTERBROOK, *Chief Judge*
Hon. RICHARD A. POSNER, *Circuit Judge*
Hon. KENNETH F. RIPPLE, *Circuit Judge*
Hon. DANIEL A. MANION, *Circuit Judge*
Hon. MICHAEL S. KANNE, *Circuit Judge*
Hon. DIANE P. WOOD, *Circuit Judge*
Hon. TERENCE T. EVANS, *Circuit Judge*
Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*
Hon. DIANE S. SYKES, *Circuit Judge*

Nos. 06-3517 & 06-3528

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LAWRENCE E. WARNER AND
GEORGE H. RYAN, SR.,

*Defendants-Appellants.*

_____

[Œ] This Order was originally released in typescript on October 25, 2007.

[ŒŒ] Hon. Joel M. Flaum and Hon. Ilana Diamond Rovner took no part in the consideration or decision of this matter.

————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 02-CR-506-1, 4—**Rebecca R. Pallmeyer**, *Judge.*

————————

**ORDER**

On August 28, 2007, defendants-appellants filed a petition for rehearing with suggestion for rehearing *en banc*, and on September 11, 2007, plaintiff-appellee filed an answer to the petition. The panel has voted to deny the petition for rehearing. A vote on whether to grant rehearing *en banc* was requested, and a majority of the judges in regular active service have voted to deny the petition. Judges Posner, Kanne, and Williams's joint opinion dissenting from the denial of rehearing *en banc* is appended.

The petition is therefore DENIED.

POSNER, KANNE, and WILLIAMS, *Circuit Judges*, dissenting from the denial of rehearing en banc. The panel opinions are long, but the essential case for rehearing en banc can be gleaned from the 18 bullet points in the dissent from the panel majority opinion:

●   In a case that was tried over a six month period, the jurors entered and exited the courthouse every day past scores of television and still cameras and reporters.

●   The jurors used public elevators and brushed elbows with anyone who happened to be in them.

● Although the court's intent was not to make the jurors' names public, that effort was compromised when the jurors' names were used in the in-court voir dire.

● When jury deliberations were ready to commence in the most high profile case in Chicago in recent memory, there was no thought of sequestering the jury.

● During the initial eight days of deliberations an apparent holdout juror was purportedly threatened by other jurors with a charge of bribery.

● Legal research gained by a juror from the internet was—contrary to the court's instruction—brought into the jury room in an effort to persuade the recalcitrant juror to change her position.

● A reporter for the *Chicago Tribune* advised the district court during jury deliberations that the newspaper's research had disclosed major inconsistencies between answers in a jury questionnaire and public records.

● Based on the information provided by the *Chicago Tribune,* the district judge, in concurrence with all parties, requested the U.S. Attorney's Office to conduct a background check on all jurors.

● Jury deliberations were halted following the *Chicago Tribune* disclosure and the hiatus continued during the investigation of the jurors by the U.S. Attorney's Office.

● During the five-day hiatus in jury deliberations, the exposé by the *Chicago Tribune* was published revealing that, indeed, false answers had been given on a jury questionnaire and that the sitting jurors were now under investigation.

- Amidst questions raised by the district judge concerning the necessity of advising the jurors of their constitutional rights and their right to counsel, the individual examination of six sitting and three alternate jurors was begun.

- Through the judge's examination it was determined that a majority of jurors had provided false answers under oath and could face criminal prosecution. Many jurors who were interrogated told the district judge that they were scared, intimidated or sorry for what had occurred.

- During the course of the interrogations, the jurors were granted immunity from prosecution by the U.S. Attorney.

- Some jurors later hired lawyers in order to represent their own independent interests arising from their participation in the trial.

- Two jurors who provided untruthful answers were excused from further service while others so situated were retained.

- Before the hiatus in deliberation, jurors informed the court that they were having a conflict and yet after the interrogations the judge dismissed one of the jurors in the conflict without determining whether she was a holdout juror.

- Alternate jurors were seated, but not in the order required by Rule 24.

- After eight days of deliberation by the original jury, and five days in hiatus, a reconstituted jury deliberated for ten days and returned the verdicts in this case.

*United States v. Warner*, No. 06-3517, 2007 WL 2363220, at *34-35 (Aug. 21, 2007) (Kanne, J., dissenting). "To

describe the circumstances surrounding the jury management and jury deliberations summarized above as 'nothing unusual' is to simply turn a blind eye to the realities of what occurred." *Id.* at \*35.

We agree with the panel majority that the evidence of the defendants' guilt was overwhelming. But guilt no matter how clearly established cannot cancel a criminal defendant's right to a trial that meets minimum standards of procedural justice. "If the police, after arresting [the defendant] and obtaining an eyewitness identification of him plus his confession, had taken him directly to the penitentiary on the ground that a trial would be a waste of time for someone so patently guilty, he would be entitled to release on habeas corpus; he would have been deprived of his liberty without due process of law." *Walberg v. Israel*, 766 F.2d 1071, 1074 (7th Cir. 1985). Or "if the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept." *United States v. Josefik*, 753 F.2d 585, 588 (7th Cir. 1985); see also *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005). The Supreme Court has held that a judge may not grant a directed verdict in a criminal case no matter how overwhelming the defendant's guilt, *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572-73 (1977), and that "a criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Edwards v. Balisok*, 520 U.S. 641, 647 (1997). Likewise if the jury is partial, as we noted just last month in *United States v. Vasquez-Ruiz*, No. 06-2180, 2007 WL 2695639 (7th Cir. Sept. 17, 2007), and perhaps if it is just plain befuddled. Cf. *In re Japanese Electronic Products Antitrust Litigation*, 631 F.2d 1069, 1084-86 (3d Cir. 1980).

This case is within the orbit of these principles, as the panel majority seems to have sensed; for while it pointed out that a number of objections to the conduct of the trial had been waived, it went on to discuss those objections and satisfy itself that they were unfounded or that any errors identified by them were harmless. But harmlessness is not the test of reversible error when a cascade of errors turns a trial into a travesty.

Against this it will be argued that ours is an adversary system, that a judge is just an umpire, and that it is not his or her business what procedures the opposing parties' lawyers want the trial to be governed by. But these are at best half-truths. There is an independent judicial interest in the proper functioning of the adjudicative process. That interest is at its zenith in a criminal jury trial.

We are also concerned that the panel majority opinion, unless set aside, will be read as an endorsement of laissez-faire appellate review, and that its discussion of the merits of the issues that it thought were waived or involved only harmless errors will have the force of precedent in future cases. The opinion signals an excessively tolerant attitude toward the management decisions of trial judges, as when it says that "the fact that the trial may not have been picture-perfect is, in itself, nothing unusual," 2007 WL 2363220, at *1. That is a misleading metaphor. A picture-perfect trial, especially a picture-perfect jury trial, is not only unusual; it is rarer than a hen's tooth. To suggest that the trial in this case *may* have been, at worst, of merely average imperfection may be taken by district judges in this circuit to mean that this court is largely indifferent to how trials are conducted, believing that to be the business of trial judges. Mainly it is. But a federal trial judge has an independent duty, enforceable if necessary by the appellate court, to manage a jury trial with alert concern for the difficulty of

eliciting reliable determinations from the lay persons who make up a jury, and with recognition that the difficulty grows rapidly with the length of the case.

Regarding the first point—the difficulty of eliciting reliable determinations from the lay judges whom we call jurors—one of the disturbing features of the trial in this case was the investigation, and potential prosecution, of jurors who had made misstatements on their juror questionnaires. Not only did these misstatements cast doubt on the jurors' ability to serve, but the court's grilling of the jurors on this topic may have prevented them from performing their duty conscientiously and undistractedly. They faced potential prosecution by a *party* to the case—the federal government. They may have feared perjury charges, having seen first-hand in the trial that the government prosecutes people for making false statements. Had the government fully immunized the jurors from prosecution, and had the jurors known this, there is the considerable risk that they would have been biased in favor of the government. But even if the jurors did not know that any offer of immunity had been made, they may have decided to convict the defendants in order to avoid provoking the government's ire and inviting a retaliatory prosecution of them (the jurors). The government's attempt to immunize jurors itself suggests the proceedings were broken beyond repair.

Regarding the second point—the problems associated with the length of the trial—federal trial judges (bankruptcy judges and magistrate judges as well as district judges) recognize and discharge a duty of active trial management. (So much for the umpireal analogy.) They do not defer abjectly to the lawyers' preferences regarding length of trial, number of exhibits, wording of instructions, and so forth. They often override the strong preferences of the lawyers on both sides regarding such matters. They are not umpires when it comes to manage-

ment of the trial; they are directors of the drama that we call trial by jury. (Trials are closer to theater than they are to ball games.) Of course, management decisions are committed to the trial judge's discretion. But that discretion can be abused, as it was in this case, resulting in a distended trial. The trial should not have taken anywhere near the six months that it did take. Its excessive length contributed both to the procedural errors that marred it and to the failure of judicial correction of those errors.

In civil cases, it is common for the trial judge, well before the trial begins, to go over with the lawyers the list of witnesses that each side intends to call. The judge quizzes the lawyers carefully, asking with regard to each name on the list: Why do you want to call this witness? If you do call him, what (in general terms) will he be testifying about? What will that testimony add to your case? How lengthy would his testimony be and what would he cover that requires that length of time? Do you really need witness $X$ to discuss topic $A$ when you already have $Y$ to discuss it? Can the parties agree to a stipulation in lieu of some of the evidence? Invariably after such an interrogation, the witness lists are found to be richly padded and the testimony sought to be elicited from each witness found to be full of redundancies and irrelevancies. The management-conscious judge conducts the same inquiry with respect to the documentary evidence that the lawyers want to present, which also often exceeds the reasonable limits of jurors' comprehension.

When as much of the padding of the case (that is, the case as it had been prepared by the lawyers) as possible has been removed, the judge asks the lawyers how much time they anticipate for the trial, and then fixes a limit on the length of the trial, usually a tighter limit than the lawyers want. The limit is tentative, however—flexible, not

rigid. As the trial proceeds, it may become apparent that more time is needed, and if so the judge will raise the limit.

Now it is true that the practice in criminal trials is different, mainly because the scope of pretrial discovery is so much more limited in criminal cases than in civil ones. No statute or rule empowers the judge in a federal criminal case to require witness statements or other discovery to be provided ahead of time. On the contrary, 18 U.S.C. § 3500(a) provides that "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." Similarly, Fed. R. Crim. P. 26.2(a) requires production upon motion of a statement of a defense witness (other than the defendant) only after that witness has testified on direct examination. These rules are motivated in part by concerns with possible tampering with witnesses.

But although judges cannot force the lawyers to exchange their witness lists early on, they can persuade the lawyers to do so, and should unless there are concerns with possible witness tampering. That case to one side, the *Manual for Complex Litigation* § 32.24 (Fed. Judic. Center, 3d ed. 1995) explains that "prosecutors can generally be persuaded to make early production since, by giving the defense an opportunity to prepare, it will avoid interruptions at trial and may lead to a plea."

The *Handbook of Recommended Procedures for the Trial of Protracted Cases,* 25 F.R.D. 351, 399-402 (1960), recommends pretrial conferences in complex criminal cases and cites one judge as having said that he was able to shorten a criminal trial from eight months to 59 days by holding such a conference. *Id*. at 400. The *Handbook* recom-

mends other measures as well that trial judges can use to reduce the length of federal criminal trials, *id.* at 402-03, as does the *Manual for Complex Litigation*, *supra*, §§ 32.11, 32.22, 32.33, which underscores the importance of the trial judge's

> insisting, within the limits demanded by fairness, that the case move expeditiously to conclusion; and encouraging cooperation among counsel; while recognizing counsel's obligation of zealous advocacy, the court can encourage them to confine themselves to issues that are reasonably disputable and not to assert rights that will have no impact on the outcome but whose exercise can cause delay . . . . Although criminal trials require greater circumspection in the exercise of judicial control than civil trials, the judge should not hesitate to exercise such control as is necessary to maintain order and momentum. *Unless the judge does so, such a trial may take on a life of its own, jeopardizing due process rights and imposing unreasonable costs and burdens . . . .* The seriousness of the issues at stake may lead the attorneys to try the case leaving no stone unturned. This requires the judge to assert and retain control of the proceedings in order to move them to an expeditious conclusion. The trial schedule is an important aspect of that control . . . . [W]hatever the schedule, interruptions should be avoided . . . . Unnecessary witnesses and exhibits should be eliminated as much as possible during pretrial; some may, however, become unnecessary only after developments at trial. The judge should exclude witnesses or exhibits that are obviously redundant or otherwise unnecessary, and should curtail redundant and needlessly lengthy interrogation. [Emphasis added, citations omitted].

All the legal authority a trial judge needs for streamlining a criminal trial is the judiciary's inherent authority

to manage trials with due regard for eliciting intelligent consideration of the issues by the jurors, plus Rule 403 of the Federal Rules of Evidence, which allows the judge to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As the *Manual for Complex Litigation* points out, Rule 403 is enforced most effectively when it is applied before the trial begins, so as to avoid lengthy sidebars. Motions in limine are of course common, and frequently granted, in criminal as in civil trials.

We have authorized the trial judges in criminal trials to place time limits on testimony. *United States v. Vest*, 116 F.3d 1179, 1186-87 (7th Cir. 1997), while pointing out that they "are best used as guideposts rather than deadlines in criminal trials, and . . . are no substitute for involved trial judges who must always shepherd trials along, curtailing repetitive, irrelevant and immaterial questioning."

None of these powers to prevent unduly protracted trials has to lie dormant until awakened by a motion. The importance of the trial judge's vigorous exercise of his or her powers lies in the fact that a trial of the length of the trial in this case places excessive strain on the jury system. It is, to begin with, difficult to assemble a competent jury if you warn the prospective jurors that the trial may go on for six months. In fact the judge in this case warned that it would last "only" four months. We do not know how the jurors felt when they discovered that their tour of duty had been extended without forewarning or their consent.

Moreover, the longer the trial, the less likely the jury is to be able to render an intelligent verdict. Jurors be-

come overwhelmed by the volume of evidence and numbed by its repetitiousness. Their attention flags; their minds wander; the witnesses—there were more than a hundred in the trial of the two defendants—get mixed up in the jurors' minds, or forgotten; the profusion of exhibits—there were more than a thousand—makes the documentary record unintelligible. The impressions created by the closing arguments are likely to wipe out everything that went before. Jury comprehension has been found to diminish after a mere 20 days of trial. Richard Lempert, "Civil Juries and Complex Cases: Taking Stock After Twelve Years" 20 (Center for Research on Social Organization Working Paper Series #488, Nov. 1992), http://deepblue.lib.umich.edu/dspace/bitstream/2027.42/51254/1/488.pdf, visited Sept. 21, 2007; *A Handbook of Jury Research* § 3.02(c), p. 3-6 (Walter F. Abbott & John Batt eds. 1999).

Twenty days and up happens also to be the top category of federal trials by length, and fortunately few federal criminal trials last that long. *Annual Report of the Director of the Administrative Office of the United States*, 2006, tab.T-2, http://www.uscourts.gov/judbus2006/contents.html (visited Sept. 21, 2007). Why did this one? What was special about it? The prominence of defendant Ryan? That is not a proper reason in a legal system that aspires to equal justice for all.

A study in which jurors in long (more than 20 days) and short (1 to 6 days) federal trials (albeit civil rather than criminal) were interviewed found a number of disquieting differences. Jurors in the long trials were substantially more likely to be retired or unemployed and substantially less likely to have a college education. Nearly three-fourths of the jurors in the lengthy trials said the evidence was "difficult" or "very difficult" to understand, compared to 30 percent who reported the same in short trials. Of course the length of the trial might

be correlated with the complexity of the evidence, and the latter might be the befuddling force. But this would not adequately explain why twice as many jurors in long than in short trials reported their attention wandering during the presentation of evidence either "occasionally" or "quite a lot," and why more than twice as many (amounting to almost half of all the jurors who were interviewed) found it difficult or very difficult to understand how they were supposed to reach a verdict. Joe S. Cecil et al., *Jury Service in Lengthy Civil Trials* 1, 9, 11-13, 28 (tab. 7), 33 (tab. 8) (Fed. Judic. Center 1987).

So now imagine jurors' mental state after six months, bearing in mind that memory loss and the psychological or cognitive problems of jurors in a super-long trial compound the first problem, the difficulty of recruiting competent jurors for protracted trials: a less intelligible trial is heard by a less capable jury. The longer the trial, moreover, the likelier jury misconduct becomes. The jurors become bored, impatient, irritated; the judge's instruction against discussing the case before the jury retires to deliberate becomes increasingly irksome and likely to be disobeyed.

And the parties (more often the defendant than the prosecutor, since a conviction is a more likely outcome of a federal criminal trial than an acquittal) lose, as a practical matter, much of the protection that the judge is supposed to provide against jury misconduct. Imagine how a district judge who has spent six months presiding at a trial, doubtless bored to tears much of the time by its meandering pace, feels about the prospect of granting a mistrial and thus condemning herself (unless the parties settle) to the agony of trying the same case over again. And if the first trial wasn't boring, the second has got to be excruciatingly so since the judge is hearing all the evidence for the second time. So can a defendant who moves for a mistrial at the end of a six-month trial

hope for a fair shake? The district judge seems to have been influenced in denying a mistrial by concern—unrelated to the merits of declaring a mistrial—with the difficulty of impaneling an impartial jury for a second trial when the first trial had received so much publicity, in no small part because of its length and its management problems. She said: "I have before me—nobody has called it this, but this is a motion for a mistrial at this point. If I grant this motion, these defendants are going to be tried again. I don't—I am just—I am really wondering whether if I grant the motion for a mistrial, I am effectively saying it isn't possible to pick a jury for this case."

We are not alone in our concerns about protracted trials. "Exceedingly lengthy trials lead to reduced concentration and recollection of events on the part of all participants, particularly witnesses and jurors. In very long cases, exhaustion may diminish everyone's performance. The quality and representative nature of the jury may be reduced by the fact that many citizens—often the most competent—are unable or unwilling to take the time to sit for cases lasting weeks or months." Gordon Van Kessel, "Adversary Excesses in the American Criminal Trial," 67 *Notre Dame L. Rev.* 403, 478-79 (1992); see also "Principle 12: Courts Should Limit the Length of Jury Trials Insofar as Justice Allows, and Jurors Should Be Fully Informed of the Trial Schedule Established," in American Bar Association, *Principles of Juries and Jury Trials* (Aug. 2005); Patrick E. Longan, "The Shot Clock Comes to Trial: Time Limits for Federal Civil Trials," 35 *Ariz. L. Rev.* 603, 703-07 (1993). Arizona offers extra compensation to jurors who serve for more than 5 (!) days. Ariz. Rev. Stat. § 21-222(C).

The role of the courts of appeals in protecting jurors and litigants from excessively protracted criminal trials that strain the capacities of jurors, and by doing so

undermine procedural justice, merits plenary consideration by this court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*