# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 06-3848, 06-4124, & 06-4399

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDDIE JACKSON, IEANIS SHAW, AND PAMELA YOUNG,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 247—**Ruben Castillo**, *Judge.*

_____

ARGUED JANUARY 17, 2008—DECIDED AUGUST 29, 2008

_____

Before RIPPLE, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Defendants Angela Hubbard, Ieanis Shaw, Eddie Jackson, Pamela Young, and Bruce Jones were charged in a three-count indictment with bank fraud in violation of 18 U.S.C. §§ 1344 and 2. The government alleged that Ms. Shaw and Ms. Hubbard generated false mortgage loan documents in order to wire transfer mortgage loan proceeds to the personal bank accounts of friends and family. One count was

dismissed against Ms. Shaw, and a superseding indictment was returned, adding money laundering charges under 18 U.S.C. § 1957 against all defendants except Mr. Jones.

Defendants Shaw, Jackson, and Young were tried by a jury and convicted on all counts. After denying motions for a new trial, the district court sentenced the defendants to terms of imprisonment and ordered them to pay restitution. Defendants Shaw, Jackson, and Young appealed. Their appeals were consolidated.

The defendants raise three issues on appeal. They first challenge the district court's decision to exclude hearsay evidence that Ms. Hubbard lied to the government about Ms. Shaw's role in one of the wire transfers involved in the bank fraud scheme. They also challenge the sufficiency of the evidence of their guilt at trial. Lastly, they contend that in rebuttal argument government counsel improperly commented on their decisions not to testify in violation of their Fifth Amendment right to remain silent. For the following reasons, we affirm.

## I. Background

Washington Mutual Bank ("Washington Mutual" or the "bank") is the nation's largest savings and loans. Its deposits are insured by the Federal Deposit Insurance Corporation. Washington Mutual provides mortgages to its customers who are buying or refinancing homes. In 2003 its mortgage loans were processed at three sites, including Downers Grove, Illinois.

The mortgage loan processing was compartmentalized into discrete job functions similar to an assembly line. First, the loans were solicited by mailings to existing Washington Mutual customers. If a customer completed certain paperwork and returned it, employees at the Downers Grove facility put the customer's personal information into a loan processing computer system called "Pronto." The mortgage loan application then went to "openers," employees who were responsible for compiling required forms and documents for a particular loan and sending the loan on to the next stage of the process. The loan file next moved on to the underwriting department, where underwriters decided whether to approve, decline, or suspend the loan based on credit information in the loan file. If a loan was approved, then the loan file moved on to the processing department. Employees in that department were responsible for gathering any additional information needed to complete the mortgage loan process. Once all these steps were completed, the file moved to the closing department where employees called "closers" worked with title agents and attorneys to reconcile loan fees and balance and fund the mortgage loan. Closers were responsible for preparing all legal documents for loan closing, many of which were prepared using the Pronto system. Openers and closers had no business reason to interact in order to complete their respective job functions.

One type of document that the closers were responsible for preparing was the "wire transfer worksheet." These worksheets were used to initiate the actual transfer of funds from the bank to the specific closing location in

order to fund a mortgage loan. The wire transfer worksheets contained information such as the loan applicant's name, the loan number, the amount of the loan, and the location where the funds were to be sent. In 2002 and 2003, after the closer prepared the wire transfer worksheet, Washington Mutual's procedures required that two persons sign the worksheet before it moved on to the wire room for funding. The first person was the closer who had finalized the loan paperwork; the second was a manager at the Downers Grove facility. In 2002 and 2003, at the height of the mortgage refinancing boom, Washington Mutual employed full-time closers, who were regular employees, and contract closers, who were brought in on a part-time basis to assist with the increased volume of loan applications. Full-time closers were authorized to sign wire transfer worksheets; contract closers were not. Once the wire transfer worksheet had the required signatures, it was faxed from the Downers Grove facility to the Washington Mutual wire room in New York. Employees in the wire room reviewed the worksheet for approvals and authorizing signatures and generated the actual disbursement or wire of bank funds to the settlement agent, usually a title company or attorney. Wire transfers of bank funds for mortgage loans were almost never sent to the bank account of an individual borrower.

The Pronto system also maintained an accounting of loans that had been approved and of bank funds that had been dispersed to fund those loans. Pronto allowed wire transfer requests to be "reversed." This could be necessary where a loan funding document was not executed

properly or where a home sales transaction fell through at the last minute. The process of reversing a wire transfer was easy and only required a "couple clicks of a button." The process could also be used to conceal a fraud. In this case, the defendants reversed wire transfers in Pronto before the system completed its daily accounting, which allowed them to conceal their fraud for some time. But the process of reversing wire transfers left forensic evidence. One could determine which Washington Mutual employee reversed a wire transfer in Pronto by examining the funding screen for that wire reversal and matching up the user identification number associated with the reversal with the master list of identification numbers for bank employees. Every employee who reversed a wire transfer in Pronto left a digital fingerprint of that activity.

In early May 2003, TCF Bank notified the loss prevention team at the Downers Grove facility of a large wire transfer of mortgage loan funds from Washington Mutual into the personal bank account of TCF Bank customer Yvette Hulet. The May 8, 2003 wire transfer to Ms. Hulet's account was in the amount of $345,943.80. The wiring of such a large sum of mortgage money into a personal bank account immediately raised red flags. The loss prevention team began an investigation into the wire transfer and determined that no one with the name Yvette Hulet had a pending mortgage loan application with Washington Mutual. The team then found the wire transfer worksheet used to generate the Hulet wire. Examination of the worksheet revealed that it had been printed on the then-pending mortgage loan applica-

tion of a person named Percy Williams. In other words, the worksheet had Mr. Williams's name and loan number on it, but Ms. Hulet's name was listed as the beneficiary of the wire and her TCF Bank account was the account to be credited.

Further examination of the worksheet revealed additional evidence of fraud. One of the authorizing signatures on the worksheet was Stan Zotas, who was no longer employed by Washington Mutual at the time of the "loan." The Washington Mutual investigators determined that whoever generated the fraudulent wire transfer had cut and pasted the authorization signatures from a legitimate wire transfer worksheet onto the same section of the fraudulent Hulet worksheet and then sent it to the wire room for funding. The investigators concluded that the fraud was an inside job because the hard copies of legitimate wire transfer worksheets were only accessible to any current Washington Mutual employee. The investigators also discovered that six wire transfers in Hulet's name had been printed through Pronto in early May 2003, though only one wire transfer worksheet had been faxed to the wire room in New York. In addition, these six wire transfers had been printed using Ms. Hulet's personal and bank information and a pending loan application, and the wires had been reversed in Pronto.

Washington Mutual attempted to determine whether any other similar fraudulent wire transfers had occurred from the Downers Grove facility. An investigation disclosed that wire transfers of mortgage loan funds had been made from Washington Mutual to the personal

bank accounts of Pamela Young, Eddie Jackson, and Bruce Jones. First, on January 28, 2003, a wire transfer of $194,471.70 was made into Ms. Young's personal checking account at Bank One. The wire transfer sheet contained Ms. Young's name, the name of her bank and her bank account number. The Young wire transfer sheet had been printed on the pending loan application of Washington Mutual customer Beverly Emon, also a Washington Mutual employee. Next, on April 1, 2003, a wire transfer of $250,641.40 was made into Mr. Jackson's personal bank account at TCF Bank. The wire transfer had been printed on the pending loan application of Washington Mutual customer Frank Knoll. Then on April 29, 2003, a wire transfer of $187,134 was made into Mr. Jones's personal bank account at Bank One. This wire transfer had been printed on the pending loan application of Washington Mutual customer Mark Corvo. Four other wires were printed with Mr. Jones's name, but were not sent to the wire room for funding and were reversed before a wire transfer took place. The Washington Mutual investigators also discovered five wires in Pronto that had been printed in April 2003 in the name of George Davis, Defendant Shaw's husband, for amounts ranging from $90,000 to a bit over $100,000. None of the Davis wires were sent to the wire room for funding.

The Washington Mutual investigators took steps to determine whether the Young, Jackson, and Jones wires were legitimate and found similar evidence of fraud in each of them. Neither Young, Jackson, nor Jones was a Washington Mutual mortgage loan customer in the winter or spring of 2003, and the authorization signa-

tures on each wire had been cut and pasted from legitimate worksheets. Washington Mutual's investigation led to Angela Hubbard and Ieanis Shaw. Ms. Hubbard had been a contract closer at the Downers Grove facility from September 2002 until April 28, 2003, her last day of employment. Ms. Shaw was hired as a contract opener at the Downers Grove facility in late August 2002 and then made a full-time employee in March 2003. Her last day of employment with Washington Mutual was May 20, 2003.

Before the January 28 wire transfer of $194,471.70 into Ms. Young's personal bank account, Ms. Young's checking account had maintained very low or negative balances. Her bank records show that the day after the transfer, January 29, 2003, she opened a new savings account at Bank One in Texas and transferred $94,243.58 from her checking account into her new savings account. Bank records further show that on January 30, 2003, $45,207.12 was withdrawn from this new savings account. Also on January 29, Ms. Young wrote a personal check to Bank One to obtain a cashier's check made payable to Angela Hubbard in the amount of $97,000. The cashier's check later was endorsed by Ms. Hubbard. Bank Calumet records reflect that on February 3, 2003, Ms. Hubbard deposited $46,000 into her checking account, used $50,000 to open a new savings account, and received $1,000 cash.

Ms. Young and Ms. Hubbard are sisters. Telephone records revealed that from January 1 through January 24, 2003, they spoke on the phone only three times for a total of forty-two minutes. But during the ten days from

January 25 through February 3, 2003, the period surrounding the wire transfer, they spoke on the phone thirty-six times for a total of 228 minutes. In the remainder of February 2003, they spoke eleven times for a total of 108 minutes.

On April 1, 2003, $250,641.40 was wired from Washington Mutual to a personal checking account at TCF Bank opened by Mr. Jackson on March 23, 2003. The account had very low or negative balances before the transfer. The same day as the wire transfer, Mr. Jackson wrote a personal check on the account in the amount of $125,000 payable to Angela Hubbard. On April 3, 2003, that check was deposited into Ms. Hubbard's personal checking account at Bank Calumet and Ms. Hubbard wrote a personal check on her account payable to Ms. Shaw for $10,000. This check was later deposited into Ms. Shaw's bank account. A week later Ms. Hubbard wrote another personal check for $10,000 payable to Ms. Shaw. This check also was deposited into Ms. Shaw's account. Mr. Jackson ran through the money he retained rather quickly on cash withdrawals, furniture, vehicles, and gifts to family and friends. On June 23, 2003, less than three months after the wire transfer, his account balance was near $0.

Telephone records of calls between Mr. Jackson and Ms. Hubbard reveal a spike in activity in the time period surrounding the April 1 wire transfer. In January and February 2003, Mr. Jackson and Ms. Hubbard spoke nine and seven times, respectively, for a total of fifty-three minutes each month. From March 1 through March 25,

2003, they had sixteen telephone conversations for a total of sixty-six minutes. However, during the ten days from March 26 through April 4, 2003, they had seventy-three telephone conversations for a total of 222 minutes.

In April 2003, Ms. Shaw purchased two wedding rings from the Jewelry Exchange, valued at $3,225.64 and $2,312.21, respectively. That same month Ms. Shaw and her husband went on a honeymoon to Jamaica at the cost of $3,306. Then on May 8, 2003, Ms. Shaw purchased approximately $12,500 in furniture from Harlem Furniture.

On April 29, 2003, $187,134 was transferred by wire from Washington Mutual to Mr. Jones's personal checking account at Bank One. On May 1, Mr. Jones obtained two cashier's checks. The first, in the amount of $63,567, was made payable to Ms. Hubbard; the second, in the amount of $60,000, was made payable to Ms. Shaw. Mr. Jones testified that Ms. Hubbard had instructed him to divide the proceeds of the wire transfer three ways and to obtain two cashier's checks, one for her and one for Ms. Shaw. He also testified that he had never met Ms. Shaw before. Mr. Jones used his share of the proceeds to buy some vehicles and pay off some bills. Ms. Shaw's bank records show that on May 2, 2003, she opened a new savings account at TCF Bank with the $60,000 cashier's check. She then transferred $30,000 from that account into her checking account.

Washington Mutual's investigation revealed that the authorizing signatures on the Jones wire transfer were identical to those on the worksheet involved in the Hulet wire transfer that had prompted the investigation. Five

wires had been printed in Mr. Jones's name, but four were reversed before the real wire took place. Ms. Hubbard's user identification number was used to reverse the first four Jones wires in Pronto. Ms. Shaw's user identification number was used to reverse the real wire transfer on April 29, the day after Ms. Hubbard's employment at Washington Mutual ended. Ms. Shaw's user identification number also was used to reverse all five wires printed in her husband's name and all of the Hulet wires as well. The investigation also revealed that two wires had been printed in Mr. Jackson's name. The first was printed and reversed in Pronto on March 28, 2003; Ms. Shaw's user identification number was used to reverse the wire. Ms. Hubbard's user identification number was used to reverse the real wire transfer on April 1, 2003.

On March 17, 2005, Defendants Hubbard, Shaw, Jackson, Young, and Jones were charged in a three-count indictment with a scheme to defraud Washington Mutual and to obtain monies and funds owned by and under the custody and control of the bank in violation of 18 U.S.C. §§ 1344 and 2. The government alleged that Ms. Shaw and Ms. Hubbard generated false mortgage loan documents in order to wire transfer mortgage loan proceeds to the personal bank accounts of friends and family, including Ms. Hubbard's sister, Ms. Young, and Ms. Hubbard's longtime friend, Mr. Jackson. Mr. Jones and Ms. Hubbard entered into written plea agreements. On August 30, 2005, Mr. Jones pled guilty to count three of the indictment which alleged the fraudulent wire transfer into his account. On October 25, 2005, pursuant to a written

plea agreement, Ms. Hubbard pled guilty to count one of the indictment alleging the fraudulent Young wire transfer.

As part of her plea agreement, Ms. Hubbard agreed to cooperate with the government and to provide complete and truthful information during its investigation and in preparation for trial of the co-defendants. Both in her proffer of her involvement in the scheme and in her plea agreement, Ms. Hubbard implicated Ms. Shaw in the Young wire transfer. Specifically, Ms. Hubbard admitted certain facts as a basis for her plea: In January 2003 she and Ms. Shaw "began talking about the possibility of attempting to fraudulently wire money from Washington Mutual into someone else's bank account"; they "agreed they would first attempt this scheme by wiring money to [Ms. Hubbard's] sister, co-defendant Pamela Young"; after Ms. Young provided Ms. Shaw with her personal and banking information, "Shaw generated fraudulent mortgage loan documents in Young's name and sent a wire request for mortgage loan funds to be disbursed to Young's personal bank account"; and Ms. Hubbard, Ms. Shaw, and Ms. Young executed the scheme on January 28, 2003, by causing a wire transfer of loan funds to Ms. Young's checking account and subsequently agreed on how to divide the proceeds from the scheme, with Ms. Young keeping half and Ms. Hubbard and Ms. Shaw dividing the other half.

On January 20, 2006, shortly before the start of the scheduled jury trial, Ms. Hubbard told the government that she had not been truthful in her proffer and plea

agreement. She claimed that Ms. Shaw had no active role in the Young wire transfer. More specifically, Ms. Hubbard said that it was she who contacted Ms. Young about participating in the fraud scheme, obtained Ms. Young's bank account information, and generated the fraudulent wire transfer worksheet. However, Ms. Hubbard also said that she and Ms. Shaw had conversations about wiring money into people's bank accounts and that Ms. Shaw knew Ms. Hubbard was involved in the wire transfer to Ms. Young's account. Ms. Hubbard added that after learning how much money Ms. Hubbard and Ms. Young received, Ms. Shaw said she would like to get involved.

The morning that trial was to commence, the government informed the court that Ms. Hubbard had advised that information she previously had provided was not truthful. The government took the position that Ms. Hubbard had lied in her proffers and in open court during her plea hearing and was no longer usable as a witness. The government moved to revoke Ms. Shaw's plea agreement and vacate her guilty plea. The district court granted these motions and continued the trial date. The government then moved to dismiss count one of the indictment (involving the Young wire transfer) as to Ms. Shaw. The district court granted this motion. On March 1, 2006, the grand jury returned a nine count superseding indictment against all defendants except Mr. Jones, who by then had already pled guilty. The superseding indictment added money laundering charges in violation of 18 U.S.C. § 1957.

After the superseding indictment was filed, the gov-
ernment filed a supplemental evidentiary proffer to
admit co-conspirator statements. (The district court
previously had granted the government's motion to
admit co-conspirator statements based on a proffer that
relied heavily, but not exclusively, on Ms. Hubbard's
statements.) The supplement proffered that Mr. Jones
would testify that Ms. Hubbard told him that Ms. Shaw
was orchestrating the fraud and that Ms. Hubbard could
wire him money only if "Ieanis would do it."

Defendants Shaw, Jackson, and Young were tried by a
jury and convicted on all counts. During trial, the gov-
ernment moved to preclude the defense from presenting
evidence about Ms. Hubbard's January 20th partial recan-
tation through the cross-examination of the government
agent, Mike Clifford. Ms. Shaw's counsel argued that the
evidence that Ms. Hubbard recanted statements she had
made to the government about Ms. Shaw's involvement
in the Young wire transfer was admissible as statements
against interest under Fed. R. Evid. 804(b)(3).[1] The district
judge cautioned, "Just before me Miss Hubbard has
said conflicting things. So for me to allow in some type
of hearsay statement that Miss Hubbard made is going
to take a lot of corroborating circumstances for that to
come in." The court ultimately found insufficient corrobo-

---

[1] Only Ms. Shaw's counsel sought the admission at trial of
Ms. Hubbard's January 20 partial recantation. Mr. Jackson's
counsel did not take a position on the statements' admissibility,
and Ms. Young's counsel actually objected to their admission.

rating circumstances to admit the hearsay, sustained the government's objection and thus excluded the evidence.

At trial, consistent with the government's proffer, Mr. Jones testified that he knew Ms. Shaw was involved in the fraud scheme because Ms. Hubbard had told him so. He also testified that when he asked Ms. Hubbard if he could get some money wired to him, she said that she could not do it, but she would check with Ieanis to see if Ieanis could do it.

Ms. Shaw and Ms. Young moved for a new trial. The district court treated the motions as made by all defendants and denied the motions. The defendants were sentenced to terms of imprisonment and ordered to pay restitution. At sentencing, Ms. Shaw again raised the issue of Hubbard's recanted statements. Judge Castillo said with respect to Ms. Hubbard, "I think her credibility is zero at this point, as I've seen her take inconsistent positions before this Court during plea allocutions that occurred on the record under oath, and so I could not in good conscience admit any of her out-of-court statements, and so that was the basis for that ruling . . . ." Shaw, Jackson, and Young timely appealed their convictions. Their appeals were consolidated and are before us now.

## II. Discussion

On appeal, the defendants raise three challenges to their convictions. They first contend that the district court erred in excluding hearsay evidence that Ms. Hubbard lied to the government about Ms. Shaw's role in the

Young wire transfer. They also challenge the sufficiency of the evidence of their guilt at trial. Finally, the defendants contend that in rebuttal the government improperly commented on their decisions not to testify in violation of their Fifth Amendment right to remain silent. Each of these challenges fails, as explained below, so we affirm.

## A.  Exclusion of Ms. Hubbard's Statements

The defendants contend that the district court erred by excluding evidence that Ms. Hubbard recanted prior statements and lied to the government about Ms. Shaw's involvement in the Young wire transfer. They assert that the excluded evidence was essential to their case and, as a result, its exclusion denied them a fair trial. This court generally reviews a district court's decision regarding the admission of evidence for an abuse of discretion. *United States v. Swan*, 486 F.3d 260, 263 (7th Cir. 2007). As noted, however, only Ms. Shaw sought admission of Ms. Hubbard's January 20th recanting statements; Mr. Jackson did not address the evidence and Ms. Young actually objected to their admission. This is a clear case of waiver by Ms. Young of any right to challenge the exclusion of the statements, *see United States v. Clements*, 522 F.3d 790, 793 (7th Cir. 2008) ("Waiver occurs when a criminal defendant intentionally relinquishes a known right."), and a forfeiture by Mr. Jackson of any such right, *see id.* ("Forfeiture occurs when a defendant negligently fails to assert a right in a timely fashion."). Waiver extinguishes any error, precluding appellate review; forfeiture, however, allows for plain error review. *Id.* A plain

error "must be clear or obvious and affect substantial rights in order to warrant reversing the district court's decision" as to the admissibility of evidence. *United States v. Schalk*, 515 F.3d 768, 776 (7th Cir. 2008) (citation omitted). Thus, we review the exclusion of this evidence for an abuse of discretion as to Ms. Shaw and for plain error as to Mr. Jackson. And because of Ms. Young's waiver, our review is precluded as to her.

Prior to analyzing admissibility under Rule 804(b)(3), we observe that by offering Ms. Hubbard's recanting statements, Ms. Shaw sought, in effect, to impeach Ms. Hubbard on a collateral matter. "[C]ontradiction is a valid method of impeachment, [but] it is well-settled that one may not impeach by contradiction regarding collateral or irrelevant matters and that a party may not contradict for the sake of contradiction." *United States v. Bitterman*, 320 F.3d 723, 727 (7th Cir. 2003) (quoting *United States v. Kozinski*, 16 F.3d 795, 805-06 (7th Cir. 1994)). We note that this rule ordinarily is utilized when a witness is testifying, and Ms. Hubbard never testified as a witness. However, in our view, the rule is equally applicable where a party attempts to put a non-testifying person's statement before the trier of fact solely to impeach that person. The jury was not asked to determine whether Ms. Shaw participated in the Young wire transfer: before trial the government had dismissed the Young wire transfer count against Ms. Shaw. Furthermore, Ms. Hubbard's earlier statements that Ms. Shaw participated in the Young wire transfer were not before the jury. Thus, in order for the jury to find that Ms. Hubbard lied about Ms. Shaw's participation in the Young wire transfer, the

jury would also have to hear evidence that Ms. Hubbard had made statements implicating Ms. Shaw in that transaction. Such evidence was irrelevant because Ms. Shaw was no longer charged with any offense arising out of the Young wire transfer. The only purpose of presenting evidence that Ms. Hubbard recanted prior statements implicating Ms. Shaw in the Young wire transfer was to prove that Ms. Hubbard was lying. But "[m]erely attempting to prove that a witness is lying is not a proper purpose of impeachment by contradiction." *Kozinski*, 16 F.3d at 807. And the district judge could have excluded this collateral and irrelevant evidence under Fed. R. Evid. 403 because its tendency to mislead and confuse the jury outweighed its negligible probative value. All that said, we move on to consider whether the district court abused its discretion in excluding the evidence under Rule 804(b)(3).

Under Fed. R. Evid. 804(b)(3), hearsay statements are not excluded by the hearsay rule if "(1) the declarant is unavailable as a witness, (2) the statement was against the declarant's penal interest when made, and (3) corroborating circumstances clearly suggest that the statement is trustworthy." *United States v. Loggins*, 486 F.3d 977, 981 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 805 (2007); *see also United States v. Leahy*, 464 F.3d 773, 797-98 (7th Cir. 2006), *cert. denied sub nom. Duff v. United States*, 128 S. Ct. 46 (2007). The proponent of the hearsay statement bears the burden of demonstrating that each of these elements is satisfied. *United States v. Robbins*, 197 F.3d 829, 838 (7th Cir. 1999). Here, the district court found—and the government does not dispute—that Ms. Hubbard was

unavailable to testify because she would assert her Fifth Amendment right against self-incrimination. The government also concedes, and we accept, that Ms. Hubbard's recantation of her prior statements implicating Ms. Shaw in the Young wire transfer were against Ms. Hubbard's penal interest. Ms. Hubbard stood to and did, in fact, lose the benefits of a favorable plea agreement and exposed herself to additional criminal charges. Thus, the only issue is whether the defendants have shown that corroborating circumstances clearly suggest that Ms. Hubbard's January 20 statements were trustworthy.[2]

The district judge's determination as to the trustworthiness of an out-of-court statement is entitled to considerable deference and should be upheld unless "clearly erroneous." *United States v. Amerson*, 185 F.3d 676, 684 (7th Cir. 1999); *see also United States v. Hall*, 165 F.3d 1095, 1112 (7th Cir. 1999). We have emphasized that Rule 804(b)(3) "*expressly* requires the exclusion of out-of-court statements offered to exculpate the accused unless there are corroborating circumstances that 'clearly indicate' the trustworthiness of the statement." *Hall*, 165 F.3d at 1112 (quoting *United States v. Garcia*, 897 F.2d 1413, 1420 (7th Cir. 1990)). The defendants submit that the statements in question were admissible based on consideration of

---

[2] Ms. Hubbard's recanting hearsay statements concern only the first wire transfer into Ms. Young's account. The recantation has no relevance as to either Ms. Shaw or Mr. Jackson who were not charged under the count arising from that wire transfer.

the factors from *United States v. Nagib*, 56 F.3d 798 (7th Cir. 1995). In *Nagib* we identified three factors for district courts to consider when determining whether corroborating circumstances exist for Rule 804(b)(3) purposes: (1) the relationship between the declarant and the exculpated party; (2) whether the statement was voluntary and given after *Miranda* warnings; and (3) whether there is any evidence the statement was made to curry favor with authorities. *Id.* at 805 (citing *United States v. Garcia*, 986 F.2d 1135, 1140 (7th Cir. 1993)).

These factors might seem to provide some weight in favor of finding corroborating circumstances here. Ms. Hubbard and Ms. Shaw did not have a close personal relationship which one would expect for Ms. Hubbard to be motivated to falsely exculpate Ms. Shaw—though they were close enough to be involved in the fraudulent scheme together. Ms. Hubbard had been advised of her *Miranda* rights and made the statements in the presence of her counsel. It seems that her statements were voluntary; the government does not suggest otherwise. Nor is there anything in the record to suggest that Ms. Hubbard recanted her prior statements in order to curry favor with the government. To the contrary, Ms. Hubbard would have known that recanting her prior statements and admitting to having lied to the government in pretrial preparation, in her plea agreement, and even under oath at her plea hearing would result in the withdrawal of her plea agreement, at the least, and expose her to additional criminal charges.

We have never said, however, that the considerations we identified in *Nagib* were the *only* factors to be

weighed in determining whether corroborating circumstances exist. *See Am. Auto. Accessories, Inc. v. Fishman*, 175 F.3d 534, 541 (7th Cir. 1999) (stating that the factors to consider in determining whether corroborating circumstances exist "include" the factors identified in *Nagib*); *Garcia*, 986 F.3d at 1140 (indicating that the case law identifies some circumstances relevant to determining whether corroborating circumstances clearly indicate trustworthiness). Other circumstances in this case strongly detract from any corroboration raised by the *Nagib* factors. Ms. Hubbard's statements that Ms. Shaw was not directly involved in the Young wire transfer clearly contradicted her several prior statements to the government, in her plea, and affirmed under oath, that Ms. Shaw was involved in the Young wire transfer. We have concluded that similar circumstances justified the conclusion that a statement lacked the requisite trustworthiness for admission under Rule 804(b)(3). *United States v. Groce*, 999 F.2d 1189, 1190-91 (7th Cir. 1993) (upholding district court's conclusion that out-of-court statement lacked the trustworthiness required under 804(b)(3) where the declarant "gave several conflicting statements, most of which contradicted the statement [sought to be admitted]").

The defendants argue that Ms. Hubbard's statements recanting her prior statements about the fraud scheme were corroborated by other evidence, but her prior statements implicating Ms. Shaw were not. We disagree. Specifically, the defendants point to the evidence that none of the co-defendants other than Ms. Hubbard knew Ms. Shaw. While the government did not have

evidence to suggest that Ms. Shaw would risk being charged with a crime solely to benefit persons she did not know, it did offer evidence that Ms. Shaw herself benefitted from her participation in the scheme. The evidence allowed a reasonable jury to find that Ms. Shaw received $80,000 for her role in the Jackson and Jones wire transfers. This, and other evidence, for example, the use of Ms. Shaw's user identification number in fraudulent wire transfers, and the timing of the Jones wire transfer and Hulet wire transfers after Ms. Hubbard had left Washington Mutual's employ, corroborated Ms. Hubbard's earlier statements as to Ms. Shaw's involvement in the scheme to defraud.

As Judge Castillo explained, because Ms. Hubbard made conflicting statements before him, "a lot of corroborating circumstances" would be required to admit her recanting hearsay statements. In effect, he was saying that her statements were so conflicting that her recanting hearsay statements were untrustworthy. The judge later reiterated that Ms. Hubbard's credibility was "zero" and he "could not in good conscience admit any of her out-of-court statements." The district judge did not err in finding that Ms. Hubbard's recanting hearsay statements lacked trustworthiness. And we cannot disagree with his conclusion that a lot of corroboration would be needed to admit the recanting hearsay statements of an incredible and untrustworthy declarant. Ultimately, Judge Castillo did not find sufficient corroborating circumstances to admit the statements. That was well within his discretion based on the entire record before him. And, as we have noted, Rule 804(b)(3) explicitly

requires a judge to exclude an out-of-court statement unless there are sufficient corroborating circumstances. *Hall*, 165 F.3d at 1112. We thus uphold the judge's decision to exclude Ms. Hubbard's recanting hearsay statements.

The defendants suggest that the district court relied on its inherent powers to exclude Ms. Hubbard's hearsay statements. They are incorrect. As explained *supra*, we do not quarrel with the district court's conclusion that there were insufficient corroborating circumstances to indicate the trustworthiness of Ms. Hubbard's hearsay statements. Thus, Rule 804(b)(3) expressly required the exclusion of those statements. *See id.* Accordingly, the basis for the district court's ruling was Rule 804(b)(3), not its inherent powers.

The defendants cite *Taylor v. Illinois*, 484 U.S. 400 (1988), for the well-established proposition that it is the jury's role to assess the credibility of witnesses. But it is the judge's role to determine the admissibility of evidence. *See* Fed. R. Evid. 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court."); *United States v. Collins*, 966 F.2d 1214, 1223 (7th Cir. 1992) ("[I]t is the judge's role to determine admissibility of evidence."). A defendant's right to offer testimony is not absolute. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) (holding military rule of evidence making polygraph evidence inadmissible in court martial proceedings did not violate the accused's right to present a defense); *Taylor*, 484 U.S. at 410 ("The accused does not have an unfettered right to offer testimony that is . . .

inadmissible under standard rules of evidence."); *Malinowski v. Smith*, 509 F.3d 328, 338 (7th Cir. 2007) (concluding the district court did not violate petitioner's right to present a defense by excluding victim's school counselor's testimony at trial); *Tyson v. Trigg*, 50 F.3d 436, 444 (7th Cir. 1995) ("A court does not violate the Constitution every time it sustains an objection to the testimony of one of the defense witnesses, or for that matter every time it excludes one of those witnesses altogether."). Finally, the defendants' reliance on *United States v. Peak*, 856 F.2d 825 (7th Cir. 1988), is misplaced. The hearsay exception at issue there was the state of mind exception under Rule 803(3). *Id.* at 834. Rule 803(3) does not expressly require the exclusion of evidence absent corroborating circumstances clearly indicating the trustworthiness of the statement. Rule 804(b)(3) does.

The defendants argue that the exclusion of Ms. Hubbard's statements recanting her prior statements violated their Sixth Amendment right to confrontation. This court reviews *de novo* evidentiary rulings that affect a defendant's Sixth Amendment right to confront witnesses. *United States v. Gilbertson*, 435 F.3d 790, 794 (7th Cir. 2006). The Confrontation Clause guarantees a defendant an opportunity for effective cross-examination. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam); *United States v. Ghilarducci*, 480 F.3d 542, 548 (7th Cir.), *cert. denied sub nom. Richardson v. United States*, 128 S. Ct. 159, *and cert. denied*, 128 S. Ct. 252 (2007). There is no guarantee of cross-examination "to whatever extent[] the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Fensterer*, 474 U.S. at 20). A district

judge has wide discretion to impose reasonable limits on cross-examination, and may do so based on concerns about, *inter alia*, prejudice, confusion of the issues, or questioning that is only marginally relevant. *Id.*; *United States v. Smith*, 454 F.3d 707, 714 (7th Cir. 2006). The defendants had the opportunity to effectively cross-examine Agent Clifford, and did so. The district judge was well within his discretion in prohibiting Ms. Shaw from questioning Agent Clifford about Ms. Hubbard's recantation of her earlier statements about Ms. Shaw's role in the Young wire transfer. Ms. Shaw was not charged with participating in the Young wire transfer. Thus, testimony that Ms. Hubbard originally implicated Ms. Shaw in that wire transfer and later said she had been untruthful about that would be only marginally, if at all, relevant. Such testimony also had a strong potential for confusing the issues because Ms. Shaw was not charged with the Young wire transfer and Ms. Hubbard's credibility was not directly at issue.

Furthermore, Ms. Hubbard did not recant all of her prior statements regarding Ms. Shaw's role in the fraudulent scheme. Had the district court allowed evidence of Ms. Hubbard's statements that were exculpatory as to Ms. Shaw with respect to the Young wire transfer, the other statements that Ms. Hubbard made to Agent Clifford implicating Ms. Shaw in the overall scheme may have been admissible on redirect. *See United States v. Glover*, 101 F.3d 1183, 1189 (7th Cir. 1996) (indicating that where a fragmentary statement is introduced, Fed. R. Evid. 106 allows an adverse party to require the admission of any other part of the statement to clarify or explain the

part already received so as to avoid any misleading impression created by offering the statement outside of context). Additional statements made by Ms. Hubbard, including other things she said on January 20th, could have been offered to put the recanting statements in their proper context and to avoid misleading the jury into believing that Ms. Shaw had no involvement in the fraudulent scheme. During the same January 20th recantation exculpating Ms. Shaw in the Young wire transfer, Ms. Hubbard reconfirmed that she and Ms. Shaw had had several discussions about wiring money into other's accounts and Ms. Shaw knew that Ms. Hubbard wired money into Ms. Young's account. Ms. Hubbard further stated that after seeing that the wire transfer was successful and knowing how much money Ms. Young and Ms. Hubbard received, Ms. Shaw said she wanted to get some money through a wire transfer. Ms. Hubbard made several very damaging statements about Ms. Young's involvement in the scheme in the January 20th statement as well. The admission of the remainder of Ms. Hubbard's statements to Agent Clifford may have been highly prejudicial to Ms. Young and would have raised concerns about Ms. Young's confrontation rights. *See Crawford v. Washington*, 541 U.S. 36, 54, 59 (2004) (defendant's right to confrontation violated by admission of testimonial statements if declarant was unavailable to testify at trial and defendant did not have a prior opportunity to cross-examine the declarant); *United States v. James*, 487 F.3d 518, 525 (7th Cir. 2007) (citing *Crawford*).

The defendants assert that it was inconsistent for the district court to allow Ms. Hubbard's out-of-court state-

ments to come in through Mr. Jones's testimony but to preclude cross-examination of Agent Clifford about Ms. Hubbard's recantation of her prior statements about Ms. Shaw. The Confrontation Clause is not violated by the admission of co-conspirator statements made in furtherance of the conspiracy; such statements are not hearsay under Fed. R. Evid. 801(d)(2)(E) and not "testimonial." *United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007); *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005). The government's evidence supported the conclusion that Ms. Hubbard and the defendants on trial were involved in a scheme to defraud Washington Mutual. Ms. Hubbard's statements to Mr. Jones about Ms. Shaw's role in the scheme were statements of a co-conspirator made during the course of and in the furtherance of a conspiracy. Thus, those statements were admissible under Rule 801(d)(2)(E). Ms. Hubbard's recanting statements were not made during the course of or in furtherance of the conspiracy and thus do not fall within Rule 801(d)(2)(E). Moreover, a critical difference exists between Rule 801(d)(2)(E) and Rule 804(b)(3). The former, unlike the latter, does not expressly require corroborating circumstances indicating a statement's trustworthiness for admissibility. Therefore, the district court did not make inconsistent rulings on the admissibility of Ms. Hubbard's various out-of-court statements.[3] Further, Ms Hubbard's statements testified to by Mr. Jones

---

[3] The defendants suggest that the district court was biased against them and made rulings simply based on whether the proponent was the government or a defendant. The record does not support this claim.

were the only co-conspirator statements introduced at trial and were a relatively small piece of evidence at trial. The admission of Ms. Hubbard's statements through Mr. Jones's testimony did not violate the Confrontation Clause.

The district court was well within its discretion to limit the cross-examination of Agent Clifford by precluding inquiry into Ms. Hubbard's statements recanting her earlier statements about Ms. Shaw's role in the Young wire transfer. The decision to exclude this evidence did not violate the defendants' rights under the Confrontation Clause. We find no error, plain or otherwise, in the district court's decision to exclude the evidence.

Even if the district court erred in excluding such evidence, we will not reverse if the error was harmless. *Smith*, 454 F.3d at 715. The question is whether the erroneous exclusion of evidence "had a substantial influence over the jury and the result reached was inconsistent with substantial justice." *United States v. Savage*, 505 F.3d 754, 762 (7th Cir. 2007) (quoting *United States v. Seals*, 419 F.3d 600, 607 (7th Cir. 2005)). In determining whether an error was harmless, we consider factors such as the importance of the witness's testimony in the government's case, whether the testimony was cumulative, the presence or absence of corroborating or contradicting evidence, and the overall strength of the government's case. *Smith*, 454 F.3d at 715.

According to the defendants, Ms. Hubbard was essential to the government's case. They contend that the government's vehement argument to exclude her statements

strongly suggests it knew the statements would undermine its case. It is difficult to discern how Ms. Hubbard was essential to the government's case when she never even testified. It seems likely that the government strenuously opposed introduction of evidence of her January 20 statements because it believed then, as it argues now, that the statements were irrelevant. It is also difficult to see how the evidence of Ms. Hubbard's statements was essential to the defendants' case when the jury was not charged with deciding whether Ms. Shaw—the only co-defendant about whom Ms. Hubbard recanted any state-ment—was guilty with respect to the Young wire transfer—the only wire transfer to which the statements at issue pertained. The excluded statements would not have been the only—or even primary—evidence as to the defendants' knowledge or intent.

Here, the government's case against Ms. Shaw was overwhelming.[4] The government offered evidence that Ms. Shaw's user identification number was used to reverse several wire transfers in Pronto, including the Jones wire transfer, the Hulet wire transfers, and the five wires printed in her husband's name. Furthermore, the evidence also included Ms. Hubbard's two checks for $10,000 payable to Ms. Shaw shortly after the Jackson wire transfer and the $60,000 check from Mr. Jones, who testi-fied he had never met Ms. Shaw. The evidence of Ms. Hubbard's statements about Ms. Shaw's involvement in

---

[4] As discussed below, see *infra* II.B, the evidence against the other defendants was overwhelming as well.

the scheme introduced through Mr. Jones's testimony was helpful, but not necessary to the government's case. This circumstantial evidence corroborated Ms. Hubbard's statements about the scheme, particularly Ms. Shaw's direct participation in it. Therefore, the exclusion of Ms. Hubbard's January 20 statements recanting her prior statements of Ms. Shaw's involvement in the Young wire transfer, even if erroneous, was harmless.

### B. Sufficiency of the Evidence

The defendants contend that the evidence at trial was insufficient to prove their knowledge and intent to defraud. Their burden in doing so is heavy. *United States v. Useni*, 516 F.3d 634, 646 (7th Cir. 2008). When the sufficiency of the evidence is challenged, we review the evidence and all reasonable inferences from it in the light most favorable to the verdict. *Id.* We "will reverse only if no rational trier of fact could find the defendants guilty beyond a reasonable doubt." *United States v. DeSilva*, 505 F.3d 711, 715 (7th Cir. 2007); *see also Useni*, 516 F.3d at 646.

A conviction for bank fraud under 18 U.S.C. § 1344 requires proof of, *inter alia*, the defendant's knowing participation in a scheme to defraud a bank, *see United States v. Yoon*, 128 F.3d 515, 523 (7th Cir. 1997); *United States v. Ross*, 502 F.3d 521, 530-31 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1723 (2008), and the defendant's intent to defraud the bank, *United States v. Lamarre*, 248 F.3d 642, 649 (7th Cir. 2001). "Intent to defraud" means that the

defendant "acted willfully and with specific intent to deceive or cheat, usually for financial gain for one's self or the causing of financial loss to another." *Id.*; *see also United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007). The intent to defraud may be proven by circumstantial evidence and inferences drawn from the scheme itself. *Lamarre*, 248 F.3d at 649. Falsifying information on loan documents is circumstantial evidence of intent to defraud. *Id.*

The government offered some direct evidence of the defendants' knowledge of the scheme and intent to defraud the bank, that is, it produced Mr. Jones's testimony that Ms. Hubbard had identified "Ieanis" as an insider involved in the scheme. And we agree with the district court that the circumstantial evidence was overwhelming. The evidence against Ms. Young established that she was the sister of Ms. Hubbard, one of the insiders at Washington Mutual. Ms. Young's checking account had very low or negative balances in late 2002 and early 2003. But on January 28, $194,471.70 was transferred from Washington Mutual, the bank where her sister worked, into Ms. Young's checking account in Texas, even though she was not a Washington Mutual mortgage loan customer. The wire transfer sheet used to request the transfer contained Ms. Young's name, the name of her bank, Bank One, and her bank account number. The jury reasonably could infer that Ms. Young's personal information was on the wire transfer sheet because she had given that information to Ms. Hubbard. Phone records support the inference that Ms. Young and

Ms. Hubbard discussed the scheme to defraud Washington Mutual and that Ms. Young gave her account information to Ms. Hubbard in the days leading up to the wire transfer. Their telephone conversations increased significantly during the ten days surrounding the wire transfer.

Ms. Young's actions following the inexplicable transfer of $194,471.70 into her account provided additional circumstantial evidence of her knowledge and intent. Ms. Young never attempted to determine why she received such a large sum of money from Washington Mutual—the bank where her sister worked. Nor did she attempt to notify her bank or Washington Mutual that a mistake apparently had been made involving her account. Instead, the day after the wire transfer, as her bank records show, Ms. Young opened a new savings account and transferred $94,243.58 into that new account. She also obtained a cashier's check made payable to Ms. Hubbard for $97,000—a little more than half of the money that had been transferred into her account the day before. It was reasonable for the jury to infer that this was a kickback to Ms. Hubbard for her role in the fraudulent wire transfer. The bank records also show that the following day, $45,207.12 was withdrawn from Ms. Young's new savings account. Ms. Young argues that the government had little evidence of her activities after the wire transfer on January 28. But the government was not required to prove what Ms. Young did with the money she received in order to prove her guilty of bank fraud. *See* 18 U.S.C. § 1344; *United States v. Abboud*, 438 F.3d 554, 590 (6th Cir. 2006); *United States v. Dadi*, 235 F.3d 945, 950 (5th Cir. 2000); *see also Federal Criminal Jury Instructions of the Seventh Circuit* 266

(1999). The fact that Ms. Young did not go on a spending spree or purchase big ticket items does not exculpate her. Nor does it negate the reasonable inference of her knowledge of the scheme and intent to defraud the bank. Quite possibly, Ms. Young restrained her spending so as not to draw attention to her new-found riches.

With respect to Ms. Shaw, the evidence was more than sufficient to allow a reasonable jury to conclude that she had the requisite knowledge and intent to defraud. The evidence supported a reasonable inference that Ms. Shaw was an insider at Washington Mutual and a key player in the fraudulent scheme. As an opener, her job responsibilities would not have included accessing wire transfers in Pronto. But nonetheless, the evidence raises a reasonable inference that she accessed wire transfers—repeatedly. Every Washington Mutual employee who reversed a wire transfer in Pronto left a digital fingerprint. The investigation revealed that Ms. Shaw's user identification number was used to reverse the March 28 wire to Mr. Jackson, which preceded the real wire transfer of April 1; the April 29 wire transfer to Mr. Jones and all the Hulet wires, which occurred after Ms. Hubbard had left Washington Mutual's employ; and lastly, the five wires printed in Ms. Shaw's husband's name. While it is possible that another Washington Mutual employee used Ms. Shaw's identification number to reverse the wire transfers, the jury properly could infer that it was Ms. Shaw using her own identification number. The timing of the Jones wire transfer and all of the Hulet wires after Ms. Hubbard had left the bank meant that Ms. Hubbard was no longer in a position to reverse

these wire transfers, yet Ms. Shaw remained at the bank where she could. In addition, the Jones wire transfer was effected in a way similar to that of the other wire transfers in the scheme, and the authorizing signatures on the Jones wire transfer were identical to those on the worksheet for the Hulet wire transfer. The jury could reasonably infer Ms. Shaw's intent to defraud from her creation of fraudulent wire transfers and wire reversals. *See Lamarre*, 248 F.3d at 649.

And there was more. Shortly after the Jackson wire transfer, Ms. Shaw received two personal checks for $10,000 from Ms. Hubbard who had just received a personal check from Mr. Jackson for $125,000. The jury could reasonably infer these $10,000 checks were payment for Ms. Shaw's role in the Jackson wire transfer. As the government argues, it is highly unusual for one co-worker to give another co-worker $20,000, for no apparent reason. The evidence was that Ms. Shaw actually received these suspicious checks—they were deposited into her own bank account. Moreover, the evidence established that after the Jones wire transfer, Mr. Jones obtained a cashier's check payable to Ms. Shaw, whom he had never met, in the amount of $60,000. Mr. Jones testified that Ms. Hubbard had instructed him to divide the proceeds of the wire transfer three ways and to obtain two cashier's checks, one for her and one for Ms. Shaw. And the evidence raised an inference that someone other than Ms. Hubbard caused the Jones wire transfer; Ms. Hubbard had left Washington Mutual the day before. Thus, the jury reasonably could infer that the $60,000 cashier's check was payment for Ms. Shaw's knowing and intentional role in the Jones wire transfer.

Yet Ms. Shaw argues that there was no evidence as to what she was told about the checks she received from Mr. Jones and Ms. Hubbard. Like Ms. Young, Ms. Shaw did not spend all of the money she obtained immediately. But as stated, quick spending of ill-gotten gains is not an element of bank fraud. *See Abboud*, 438 F.3d at 590; *Dadi*, 235 F.3d at 950. Anyway there was evidence that Ms. Shaw spent a good deal of the money in a short period of time on frills such as expensive jewelry, a honeymoon to a resort in Jamaica, and new furniture. The fact that she did not spend all of the money does not negate the reasonableness of the inference of her knowledge and intent to defraud. The jury could have inferred that Ms. Shaw did not spend more of the money more quickly in order to avoid calling too much attention to her sudden windfall.

Finally, Mr. Jackson's close friendship with Ms. Hubbard was not the only evidence regarding his knowledge and intent. Mr. Jackson was not a Washington Mutual customer, yet he received a wire transfer of $250,641.40 into his newly opened bank account. This account had carried a very low and even negative balance right before the transfer. There was no evidence that Mr. Jackson ever questioned the wire transfer or notified the bank that an error had been made. Importantly, the wire transfer worksheet contained Mr. Jackson's name, his bank name, and his personal checking account number. As with Ms. Young, the jury could draw a reasonable conclusion from this evidence that Mr. Jackson had given this information to Ms. Hubbard. Also as with Ms. Young, telephone records showed a marked increase in the number and

duration of telephone calls between Ms. Hubbard and Mr. Jackson in the ten days surrounding the wire transfer. From this evidence, the jury could reasonably infer that they were planning and discussing the fraudulent wire transfer to Mr. Jones's account. The evidence of what Mr. Jackson did with the money wired to his account also raises an inference of knowledge and intent. He quickly wrote a personal check for $125,000 payable to Ms. Hubbard. The jury could infer that this was Ms. Hubbard's kickback for her role in the wire transfer. Mr. Jackson spent the money he fraudulently obtained almost as soon as it hit his account, for cash, furniture, vehicles, and gifts to family and friends. His bank account was back to a near $0 balance in less than three months. Mr. Jackson's extraordinary spending spree raises a reasonable inference of his knowing participation in the scheme and intent to defraud.[5]

In sum, the documentary evidence of the defendants' knowing participation in the scheme to defraud and intent to defraud Washington Mutual as corroborated by Mr. Jones's testimony as to how the scheme worked while he was involved was overwhelming. Therefore, the defendants' challenge to the sufficiency of the evidence fails.

---

[5] As noted, a spending spree is not a required element of bank fraud. Nonetheless, a spending spree may typically follow such fraudulent behavior.

### C. Prosecutor's Remarks in Rebuttal

The defendants argue that during closing argument the government improperly commented on their decisions not to testify. The prosecutor may comment on the weakness of the defense case in closing arguments. *United States v. Stark*, 507 F.3d 512, 519 (7th Cir. 2007). But the prosecutor may not make direct or indirect comments that invite the jury to draw an adverse inference from a defendant's decision not to testify. *Griffin v. California*, 380 U.S. 609, 614 (1965); *Stark*, 507 F.3d at 519. Improper indirect comments occur "only if (1) the prosecutor manifestly intended to refer to the defendant's silence or (2) a jury would naturally and necessarily take the remark for a comment on the defendant's silence." *United States v. Mietus*, 237 F.3d 866, 871 (7th Cir. 2001).

Where, as here, the defendants failed to object to the allegedly improper comment when made, this court reviews the comments for plain error. *DeSilva*, 505 F.3d at 717. Under this standard, the defendants have the burden of demonstrating that the remark was improper, that it denied them a fair trial, and that the outcome would have been different absent the remark. *Id.* at 718-19. If the remark is improper, the court determines whether the comment, considered in context of the record as a whole, denied the defendants a fair trial. *Id.* at 719. In so doing, we consider "(1) the nature and seriousness of the statement; (2) whether the statement was invited by the conduct of defense counsel; (3) whether the district court sufficiently instructed the jury to disregard such statement; (4) whether the defense could counter the improper

statement through rebuttal; and (5) whether the weight of the evidence was against the defendant." *Id.*

The defendants have not shown that the prosecutor's single comment in rebuttal that he was not sure he heard any explanation "from her" about where the $60,000 came from was improper. We agree that with the government that its attorney, Mr. Hotaling, did not refer to Ms. Shaw's silence but rather to the lack of explanation by her counsel, Ms. Winslow. The context of the rebuttal argument surrounding the remark supports this view. The prosecutor prefaced his rebuttal by stating that he was going "to talk a little bit about all of the different things that [the jurors] have heard from all of the different attorneys during the course of the trial—during the course of closing arguments. So I will just take it in the order that you heard it."

In her closing argument Ms. Winslow talked about the two wire transfers with which Ms. Shaw was alleged to have been involved, the typical patterns of money flow into and out of accounts in a fraudulent scheme, and the absence of such a pattern with Ms. Shaw's account. She addressed Ms. Shaw's alleged "spending spree," the computers, wire transfers and reversals, and electronic fingerprints. Ms. Winslow specifically discussed the two $10,000 checks from Ms. Hubbard to Ms. Shaw that the government had attempted to show were a kickback for the Jackson wire transfer. This discussion fills one page of the trial transcript. Then Ms. Winslow moved on to the $60,000 check, saying: "There's a lot to be said about this check and Bruce Jones . . . ." But while Ms. Winslow later

talked about Mr. Jones, she did not say much about the $60,000 check. The prosecutor merely pointed this out. We cannot conclude that the prosecutor was referring to the lack of evidence presented by Ms. Shaw herself (and inferentially the other defendants).

But even if the prosecutor's remark is viewed as improper, the defendants must show that it denied them a fair trial and that the outcome would have been different but for the remark. This burden proves insurmountable for them. The remark was not inflammatory. It was not a direct reference to the defendants' failure to testify. The remark could be understood as a response to Ms. Winslow's statement in closing that "there was a lot to be said about" the $60,000 check and Mr. Jones. Ms. Winslow really did not say much about why Mr. Jones gave Ms. Shaw the check. Her comments discussed what the evidence showed or did not show about what happened after Ms. Shaw received the money. No objection was made and no curative instruction was given at the time. Since the remark was made in rebuttal argument, the defendants had no opportunity to counter it. But this single remark was made in passing and certainly was not the emphasis of the government's arguments.

Furthermore, the district court instructed the jury—both at the beginning and at the end of trial—that the government has the burden of proving the defendants' guilt beyond a reasonable doubt and that this burden remains with the government throughout the case. The court further instructed that the defendants are never required to prove their innocence or to produce any evidence at

all. The court specifically instructed: "A defendant has an absolute right not to testify. The fact that the defendants did not testify should not be considered by you in any way in arriving at your verdict." Generally we may presume that the jury followed the court's instructions. *United States v. Warner*, 498 F.3d 666, 683 (7th Cir. 2007), *reh'g and suggestion for reh'g en banc denied*, 506 F.3d 517 (7th Cir. 2007); *United States v. Puckett*, 405 F.3d 589, 599 (7th Cir. 2005). Nothing in this record suggests that the jury was unable, or chose not, to follow these instructions. And, significantly, as explained *supra*, the evidence against all defendants was overwhelming. Thus, even if the prosecutor improperly commented on Ms. Shaw's right to remain silent, when viewed in context of the record as a whole, we cannot say that the remark deprived the defendants of a fair trial or that the outcome would have been different absent the remark.

## III. Conclusion

For the foregoing reasons, we AFFIRM the defendants' convictions.