# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-3581

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARVIN SMITH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 89 CR 175—**Charles N. Clevert, Jr.**, *Judge.*

ARGUED SEPTEMBER 23, 2005—DECIDED JULY 21, 2006

Before POSNER, RIPPLE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* In 1990, a jury found Marvin Smith guilty of one count of conspiracy to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 846. The court allowed Smith to remain free on bond pending his sentencing. Smith never appeared for his sentencing hearing and remained at large for fourteen years. In 2004, the long arm of the law caught up with Smith and the district court sentenced him to thirty years' imprisonment. Smith appeals his conviction and sentence. We affirm his conviction but vacate his sentence and remand for resentencing.

## I.

Darryl Carter and Todd Thompson were Milwaukee-based drug dealers in the late 1980s. In the summer of 1987, when Thompson needed a new source for cocaine, Carter took him to Los Angeles to meet Kevin Diggs. Diggs was the cousin of Carter's common law wife. Carter knew Diggs well; he had lived in Los Angeles for many years and had previously purchased cocaine from Diggs for his personal use. On that first trip to Los Angeles, Thompson purchased a half kilogram of cocaine from Diggs for resale in Milwaukee. In the months that followed, Carter and Thompson returned to Los Angeles between four and eight times to purchase more cocaine. On some of these trips, Thompson purchased as much as two kilograms of cocaine from Diggs and one of his associates, Gwain Collins. In late summer 1987, Diggs told Carter and Thompson that they could obtain cocaine from a man known as "June" in Cleveland. Carter, Thompson and a third man, Terry Wynn, subsequently traveled to Cleveland to meet June. June fronted three kilograms of cocaine to Thompson and his associates. In the drug business, "fronting" involves providing drugs at no cost with the understanding that the purchase price will be paid later from the proceeds of sales to third parties.

Approximately one week after June fronted three kilograms to Thompson, Diggs came to Milwaukee to collect money that Thompson owed him from prior deals. Carter attempted to set up meetings between Thompson and Diggs but Thompson failed to show up for the meetings. Diggs was unconcerned about this turn of events until Vince Wynn, an associate of Carter, told him that June had been seen in Milwaukee visiting Thompson. Diggs became concerned that Thompson now had a new source and would not pay his debt to Diggs. Diggs called Thompson to demand payment immediately. Diggs then met with Collins, Carter and Wynn at a Milwaukee hotel to discuss Thompson's debt to Diggs. As a result of this discussion, Diggs became very

angry and said he was going to call his uncle in Detroit for help in collecting the debt. The uncle, Marvin Smith, the defendant here, arrived the next morning. Smith was not actually Diggs' uncle; Smith and Diggs' father were close friends and Diggs had come to refer to Smith as his uncle. Smith, Carter and Diggs subsequently went to Thompson's house to discuss the debt. Following this visit, Carter delivered approximately $80,000 in cash to Diggs on behalf of Thompson. Later that fall, Carter delivered another $80,000 from Thompson to Diggs, in payment of this same debt.

In February 1988, Wynn brokered two thirty-kilogram cocaine sales from Diggs to a Milwaukee buyer named Jerome Mann. The next month, Wynn paged Diggs to set up another thirty kilogram purchase from Mann. Diggs called Wynn from Chicago and said he was on his way to Milwaukee to pick up the money for this transaction. Wynn obtained the money from Mann and delivered it to Diggs, Collins and Carter in Milwaukee. Once the money was paid, Wynn traveled to Chicago with Diggs, Collins, Carter and Anthony Heard, where they all checked in to a hotel. After checking in, Diggs told Wynn the cocaine had been sold to another party and they would have to travel to Detroit to pick up the thirty kilograms. The entire entourage drove to Detroit where, the next day, they visited Smith at his home. The money for the deal was delivered to Smith and counted in the presence of Diggs, Collins, Carter, Heard, Wynn and Smith. The meeting stayed in the mind of at least one of the participants because Smith was apparently very particular about the way he wanted the money stacked as it was counted. After the counting, Diggs and Collins gave Carter a suitcase filled with thirty-seven kilograms of cocaine. In addition to the bargained-for thirty kilograms, Diggs was fronting an extra seven kilograms to Wynn on credit. Carter and Heard then delivered the thirty kilograms to Mann in Milwaukee. Telephone records from this time period show

dozens of calls between the parties from the various hotel phones, cell phones and Smith's home phone.

A few weeks later, Diggs called Wynn, ready to complete another deal. Wynn and Heard drove to Chicago and met with Mann's associates to pick up the money for the deal. The money was counted and delivered to Diggs and Collins. All the parties involved proceeded to a restaurant where Diggs delivered a suitcase full of cocaine to Wynn and Heard. Again a trail of telephone and hotel records showed connections among Mann, Heard, Collins, Wynn and Smith during this time period.

In 1989, Wynn was arrested and agreed to cooperate with authorities in setting up an undercover transaction with Diggs. At this point, Wynn did not have a current number for Diggs but was able to obtain Diggs' pager number from Collins. After paging Diggs, Wynn had a series of tape-recorded telephone calls with Diggs, setting up a twenty-kilogram cocaine sale. Some of the calls were handled for Diggs by June. Although the location of the transaction changed many times, Diggs ultimately settled on Chicago. In August 1989, Diggs and June arranged for two men to deliver five kilograms of cocaine to Wynn's hotel room in Chicago. Authorities seized the cocaine and arrests ensued.

Smith testified at trial on his own behalf. He conceded that he had traveled to Milwaukee to help Diggs collect a debt but denied knowing that the debt was related to the sale of illegal drugs. He also conceded a passing acquaintance with some of the persons involved in these transactions but denied that he took part in any drug trafficking. The jury convicted Smith, the court allowed him to remain free on bond pending his sentencing and, as we noted earlier, he disappeared for fourteen years. On his return to custody, the district court sentenced him to thirty years' imprisonment. Smith's sentencing hearing occurred after this court's decision in *United States v. Booker*, 375 F.3d

508 (7th Cir. 2004) (hereafter *Booker I*), but before the Supreme Court's final resolution of *United States v. Booker*, 125 S. Ct. 738 (2005) (hereafter *Booker II*). The district court declined to use the Sentencing Guidelines in fashioning the sentence, instead turning to the relevant statutes in arriving at the final term of imprisonment. Smith appeals both his conviction and his sentence.

## II.

On appeal, Smith challenges the district court's limitations on his counsel's cross-examination of Darryl Carter, one of the witnesses against him. He contends that the district court violated his Sixth Amendment right to confront Carter by allowing the prosecutor to invoke Carter's already-waived attorney-client privilege in order to limit cross-examination. He also argues that the district court abused its discretion in allowing the prosecutor to impeach Smith with the nature of a nearly ten-year old conviction for possession with intent to deliver controlled substances. Finally, Smith challenges the district court's sentence, which failed to use the Guidelines as advisory and which exceeded the recommended Guidelines sentence without any justification.

## A.

Among the people to testify against Smith was Darryl Carter, who had struck a very favorable deal with prosecutors in exchange for his testimony. On cross-examination, Smith's attorney pointed out that Carter was charged with distributing 103 grams (less than four ounces) of cocaine when in fact he admitted to distributing vastly greater quantities. During the defense counsel's questioning of Carter on the extent of his plea deal, the government objected to questions related to Carter's conversations

with Carter's own lawyer. The court sustained the objections and restricted the cross-examination:[1]

Q:       So we've got 200 pounds of cocaine you haven't been charged with, right?

A:       Yes.

Q:       And how much, sir, based upon your training and experience is one pound of coke worth?

A:       About $8,000.

Q:       And so if you take a hundred pounds and multiply it times 8,000, you got a lot of money, don't you?

A:       Yes.[2]

Q:       Never prosecuted for any of that, correct?

A:       Yes.

Q:       Not only that, the government went and knocked off three counts of what you were charged with, didn't they?

A:       Yes.

Q:       And so when all is said and done what you pled guilty to is something where you are facing a maximum of 20 years in prison, right?

A:       Yes.

---

[1] The questions here are posed by Smith's attorney, Dennis Coffey, to Darryl Carter. Mr. Johnson is Assistant United States Attorney Mel Johnson.

[2] Using this figure of $8,000 per pound, the 200 pounds of cocaine would have been worth $1.6 million.

Q:      Now, the government told you that if you cooperated they would give you what is called a downward departure, didn't they?

A:      Yes.

Q:      And did they tell you what a downward departure was?

A:      Yes.

Q:      What is it?

A:      It would depart from the guidelines, what the guidelines recommend for my sentencing for cooperation.

Q:      And as you acknowledge in this Exhibit No. 1 [the plea agreement] your lawyer explained to you how the guidelines operate, didn't he?

A:      Yes.

Q:      And in the course of that explanation he would have told you that if you were found guilty of just 103 grams of coke . . . you would be a level 12 offender and be looking at 10 to 16 months in prison; didn't he?

A:      No.

Q:      Your lawyer never told you that?

A:      No.

Q:      Well, in this agreement you say he did, don't you?

A:      What the lawyer told me —

Mr. Johnson:    Well, Your Honor, I'll object on a few grounds. One is attorney client privi-

> lege. Mr. Carter's not obligated to tes-
> tify about his communications with his
> lawyer. And that's not what the agree-
> ment says they discussed. And just
> under Rule 403. I mean, Mr. Coffey has
> made his point. I don't see the point of
> beating this to death with Mr. Carter's
> plea agreement.

The Court:      I'm more concerned about that first
                point. And I think in fairness to the
                witness you should keep away from
                that.

Mr. Coffey:     Fine.

Tr. at 129-30. At this point, Coffey asked Carter what the court told him his sentence would be under the Guidelines without the benefit of a downward departure. Carter replied that the court told him his Guidelines sentence would be seven years but that the court ultimately sentenced him to four years of probation with the first six months to be served in a work release program. Smith's lawyer thus established that although Carter admitted to dealing more than 200 pounds of cocaine worth approximately $1.6 million, after his plea deal, he was sentenced to probation without serving a single day in prison. He also established that Carter had been a cocaine addict since at least 1986, and that during the time period covered by his testimony, he had an "unbearable" addiction to cocaine that caused him to forget things, fantasize, see things in his dreams, and left him unable to sleep or eat.

Smith argues that the district court violated his Sixth Amendment right to confront Carter by allowing the prosecutor to invoke Carter's already-waived attorney-client privilege. Smith contends that the government lacked standing to raise Carter's attorney-client privilege. More-over, Smith argues, Carter had already waived the privilege

(1) by answering questions about his discussions with his attorney; (2) by entering into a plea agreement in which he consented to testify completely and truthfully whenever asked to do so by the government, with no express exception for information learned from his attorney; and (3) by becoming an adverse party to Smith. The government concedes that the "prosecution generally lacks standing to assert a claim of privilege belonging to one of its witnesses" but argues that it had the right to bring the issue to the court's attention so that the court could protect the witness from unnecessary disclosures of privileged information. The government also argues that the district court properly exercised its discretion in limiting the cross-examination, and that Smith was able to adequately expose Carter's biases without delving into privileged communications.

We begin with the government's assertion of Carter's attorney-client privilege as an objection to defense questioning. Smith is correct that Carter's attorney-client privilege belonged solely to Carter and not to the government. *See United States v. Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994), *cert. denied*, 515 U.S. 1102 (1995) (noting that the attorney-client privilege of a government witness belongs to the witness, not the government, and that the privilege is waivable); *United States v. White*, 743 F.2d 488, 494 (7th Cir. 1984) (the government lacks standing to bring an appeal based on attorney-client privilege of the government's witness; that privilege belongs solely to the witness who must bring the issue to the trial court himself if he believed the court was not adequately protecting his privilege); *United States v. Fox*, 396 F.3d 1018, 1023 (8th Cir. 2005), *overruled on other grounds by United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005) (*en banc*) (the attorney-client privilege is personal and cannot be asserted by anyone other than the client); *United States v. Almeida*, 341 F.3d 1318, 1321 n.10 (11th Cir. 2003) (the government ordinarily lacks standing to assert the attorney-client

privilege for a witness); *United States v. Ortega*, 150 F.3d 937, 942 (8th Cir. 1998), *cert. denied*, 525 U.S. 1087 (1999) (same). Although the government did not act inappropriately in bringing the privilege issue to the court's attention, this was not a proper basis for a government *objection* to the defense questioning of Carter. *White*, 743 F.3d at 494 (noting that, although the government lacked standing to appeal on the basis of a witness's attorney-client privilege, we are mindful of the duty of every lawyer to bring to the attention of the trial court possible ethical problems in the case). Carter did not assert the privilege himself and appeared ready to answer the defense questions without limitation. He had already answered at least one question regarding what his lawyer had told him. And in response to the question to which the government objected, Carter began his answer, "What the lawyer told me—," an introduction which certainly indicates a willingness to waive the privilege. *Sarkes Tarzian, Inc. v. U.S. Trust Co. of Florida Sav. Bank*, 397 F.3d 577, 584 (7th Cir. 2005), *cert. denied*, 126 S. Ct. 398 (2005) (responding fully to questions covered by the attorney-client privilege is an implicit waiver of that privilege).

In any case, the salient issue is whether this limitation of cross-examination violated Smith's Sixth Amendment right to confront a witness against him. The Sixth Amendment right of confrontation requires that a defendant be given an opportunity for effective cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987) (the Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination); *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination). The "exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected

right of cross-examination." *Van Arsdall*, 475 U.S. at 678-79 (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)). Trial courts retain wide discretion to impose reasonable limits on cross-examination, and may impose limits based on concerns about harassment, prejudice, confusion of the issues, a witness' safety, or questioning that is repetitive or only marginally relevant. *Van Arsdall*, 475 U.S. at 679; *Quinn v. Neal*, 998 F.2d 526, 529 (7th Cir. 1993).

In general, we review a trial court's limitation on the extent of cross-examination for abuse of discretion. *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994). However, where limitations directly implicate the Sixth Amendment right of confrontation, we review the limitation *de novo*. *Nelson*, 39 F.3d at 708. Thus when deciding whether limits on cross-examination are permissible, we must first distinguish between the core values of the Confrontation Clause and more peripheral concerns which remain within the trial court's ambit. *Nelson*, 39 F.3d at 708; *United States v. Degraffenreid*, 339 F.3d 576, 581 (7th Cir. 2003). In this case, Smith's counsel established that Carter struck a very favorable plea deal in exchange for his testimony against Smith. Counsel was able to elicit that Carter was involved in more than 200 pounds of cocaine transactions, exposing him to a prison sentence that could be measured in decades. Carter admitted that he was ultimately sentenced to probation with a six-month term in a work release program. The only limitation the court placed on the cross-examination was on questions relating to Carter's discussions with his lawyer about his plea agreement. Smith's counsel was able to elicit the nature and extent of the deal and thus the scope of the motive to lie through other means. This limit on cross-examination did not deny Smith the opportunity to establish that Carter harbored a motive to lie; rather it simply limited his ability to add extra detail to that motive. "[O]nce this core function is satisfied by allowing cross-examination to expose a motive to lie, it is of peripheral

concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *Nelson*, 39 F.3d at 708. *See also United States v. Sasson*, 62 F.3d 874, 882 (7th Cir. 1995), *cert. denied*, 516 U.S. 1131 (1996). We therefore review the district court's limitation on cross-examination for abuse of discretion. The government objected to the question on multiple grounds but the district court limited the cross-examination based solely on the unasserted attorney-client privilege of the witness. This was error and thus an abuse of discretion. *United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1046 (7th Cir. 2005) (a decision that rests on an error of law is always an abuse of discretion). *Cf. Rainone*, 32 F.3d at 1206 (attorney-client privilege might have to yield in a particular case if the right of confrontation through cross-examination would be violated by enforcing the privilege).

Harmless error analysis applies to errors arising under the Sixth Amendment Confrontation Clause. *Van Arsdall*, 475 U.S. at 684; *Nelson*, 39 F.3d at 710. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684; *Nelson*, 39 F.3d at 710. Whether an error is harmless beyond a reasonable doubt depends upon factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence and the overall strength of the prosecution's case. *United States v. Castelan*, 219 F.3d 690, 696 (7th Cir. 2000). *See also Van Arsdall*, 475 U.S. at 684 (whether such an error is harmless depends on a host of factors including the extent of cross-examination otherwise permitted). Carter's testimony was obviously important to the prosecution's case against Smith. But as already noted, the limitations here did not reduce the damaging potential of cross-examination. Indeed,

Smith's lawyer questioned Carter thoroughly about every aspect of his direct testimony and his plea agreement, and Carter's motives and biases were fully exposed. The added detail from his conversations with his attorney would not have changed the outcome given the strength of the remaining evidence. Thus, the court's error in sustaining the government's privilege objection was harmless.

**B.**

In anticipation of Smith testifying in his own defense, his lawyer moved *in limine* to exclude evidence of a prior conviction for possession with intent to deliver a controlled substance, an offense for which Smith had been convicted nearly ten years earlier. Smith's counsel argued that, given the age of the conviction and its similarity to the charged conduct for which Smith was then on trial, the court should exclude it. When the court indicated its intent to allow the government to question Smith about this conviction, counsel asked the court to forbid inquiry into the nature of the felony conviction, limiting testimony to the existence of a felony conviction on a particular date. After asking the parties for precedent in support of such a restriction, the court ruled that it would allow the government to ask Smith whether he had been convicted of a felony, when he was convicted and what the offense was. *See Campbell v. Greer*, 831 F.2d 700 (7th Cir. 1987). In order to blunt the effect of this information, Smith's lawyer asked him about the conviction during direct examination. *See United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000) (a defendant may testify to the fact of a prior conviction on direct examination as a matter of trial strategy in order to lessen the impact of the information on the jury). Smith testified that he had been convicted in 1979 of "possession of controlled substance." Tr. at 10. In response to his attorney's questions, he added that the substance in

question was "diet pills." He explained that he was travel-
ing to Dallas from Los Angeles and that a friend asked him
to carry some shirts and deliver them to the friend's brother
in Dallas. When he got to Dallas, a DEA agent asked if he
could search Smith's bag and he consented. The agent found
the diet pills, which Smith insisted he had not known were
in his bag. As a result, Smith was convicted and served four
and a half months in prison.

On cross-examination, the government asked Smith about
the conviction:

Q:      Finally, let me ask you about your
        description of this case down in Dallas,
        Texas. You said you were tricked by a
        friend, is that right?

A:      Exactly.

Q:      But you were found guilty of the crime,
        weren't you?

A:      Oh, yes.

Q:      And you earlier testified that you were
        convicted for possession of a controlled
        substance, correct?

A:      Yes.

Q:      But that's not really what you were
        convicted of, was it?

A:      Yes.

Q:      Were you convicted of possession of a
        controlled substance with intent to
        deliver?

A:      Oh, well, if that's part of the charge
        with possession of a controlled sub-
        stance and with intent to deliver I
        guess that's part of it.

Q:              That's what you were convicted of?

A:              Yes.

Tr. at 39-40. In closing arguments, the government discussed Smith's motive to falsify his testimony. The prosecutor pointed out that Smith had a prior conviction for possession of controlled substances, "although he didn't volunteer at first that it was possession with intent to deliver. But in any event the fact that he has this prior conviction can be considered by you as relevant to his credibility." Tr. at 645-46. This was the entirety of the government's argument about the prior conviction.

On appeal, Smith contends that the district court abused its discretion in allowing the government to impeach Smith with the nature of his prior felony conviction. We review the district court's decision for abuse of discretion. *United States v. Smith*, 131 F.3d 685, 687 (7th Cir. 1997). Federal Rule of Evidence 609(a)(1) provides that for the purpose of attacking the credibility of a testifying defendant, evidence that the defendant has been convicted of a felony shall be admitted "if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." The rule also provides that prior convictions generally are not admissible if more than ten years have passed since the time of the conviction. Fed. R. Evid. 609(b). The parties agreed that Smith's prior conviction fell within the ten-year period, although just barely, and the district court found that the probative value of admitting the conviction outweighed the prejudicial effect to Smith.

The district court relied on *Campbell* for the proposition that the government could impeach Smith with the crime charged, the date and the disposition. *See Campbell*, 831 F.2d at 707. *Campbell* was a civil case but the rule applies in criminal cases as well. *White*, 222 F.3d at 370. That is, the government may identify the particular felony

charged, the date, and the disposition of a prior conviction for impeachment purposes. *White*, 222 F.3d at 370. As we stated in *Campbell*, "this is not to say that the opposing party may harp on the witness's crime, parade it lovingly before the jury in all its gruesome details, and thereby shift the focus of attention from the events at issue in the present case to the witness's conviction in a previous case." *Campbell*, 831 F.2d at 707. Where a defendant attempts to explain away the prior conviction by giving his or her own version of events, the door has been opened to impeachment by the prosecution on the details of the prior conviction. *White*, 222 F.3d at 370.

There was no harping or parading here. The government very simply pointed out that Smith did not fully and accurately reveal the particular felony at issue and that he tried to explain away his conviction by blaming the crime on a friend who deceived him. All of this was very appropriate under *Campbell* and *White*, especially in light of Smith's attempt to explain away the prior conviction. Nor do we accept Smith's invitation to reweigh the probative value of this information against its prejudicial effect. Smith suggests that because the ten-year-old conviction was similar to the crime charged and because the prosecution "subtly misused the nature of the prior conviction," reversal is warranted. The prosecution did not misuse the information, even subtly, and argued only that the jury could use it to assess Smith's credibility. The prosecution did not, as Smith seems to suggest, argue to the jury that because Smith committed a similar crime in the past that he was guilty of this offense. There was no abuse of discretion here.

### C.

All that remains is Smith's sentence. As we noted above, the district court sentenced Smith during the confusing period of time after our decision in *Booker I* but before the Supreme Court's decision in *Booker II*. The district court

declined to use the U.S. Sentencing Guidelines at all, instead exercising its discretion to select a sentence within the statutory range of ten years to life. The court sentenced Smith to a term of thirty years' imprisonment. This was error. Although the Guidelines are no longer mandatory, a sentencing court must still consult the Guidelines and take them into account when sentencing. *United States v. Baretz*, 411 F.3d 867, 873 (7th Cir. 2005). The provision of the Sentencing Reform Act that mandates resentencing when the challenged sentence results from an incorrect application of the Guidelines remains in effect after the *Booker* cases. A complete failure to consider the Guidelines thus requires resentencing. For that reason, we vacate Smith's sentence and remand for resentencing.

## III.

For the reasons stated above, we affirm Smith's conviction but vacate his sentence and remand for resentencing.

AFFIRMED IN PART,
VACATED AND REMANDED IN PART.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—7-21-06